## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA and
the STATE OF MICHIGAN *ex rel.*
SANDRA McLAUCHLIN,
individually, and CHRISTINA
VARNER, individually,

           Plaintiffs,

v.

HAVENWYCK HOLDINGS, INC., a
Delaware Corporation,
HAVENWYCK HOSPITAL, a
domestic profit corporation,
HAVENWYCK HOSPITAL, INC., a
domestic profit corporation, and
UNIVERSAL HEALTH SERVICES,
INC., a domestic nonprofit corporation,

           Defendants.

Case No. 2019-cv-10832

Hon. Paul D. Borman
Mag. Judge Mona K. Majzoub

FILED UNDER SEAL

---

Sarah S. Prescott (P70510)
SALVATORE PRESCOTT & PORTER, PLLC
Attorney for Plaintiffs/Relators
105 E. Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplawyers.com

---

## AMENDED COMPLAINT AND JURY DEMAND

      NOW COME Plaintiffs, by and through their attorneys, Salvatore Prescott &

Porter, PLLC, who bring this complaint and state the following:

1.     This action is brought by qui tam Relators Sandra McLauchlin and Christina

Varner, in the name of the United States Government and the State of Michigan, to recover penalties and damages arising from the submission of false Medicaid and Medicare claims by Defendants, Universal Health Services, Inc. ("UHS"), Havenwyck Holdings Inc., Havenwyck Hospital and Havenwyck Hospital Inc., all of which, on information and belief, are doing business as Havenwyck Hospital (and are herein collectively referred to as "Havenwyck" or "Defendants") in Auburn Hills, Michigan.

2.      Relators did not derive the allegations of wrongdoing noted below from public disclosures, but are "original sources" of the information on which the allegations contained herein are based, as that term is defined in 31 U.S.C. §3730(e)(4).

## Jurisdiction and Venue

3.      This action arises under the False Claims Act, 31 U.S.C. § 3729 et seq. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

4.      Venue is proper in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), and under 31 U.S.C. § 3732(a) because each Defendant transacts business within the district, and the acts proscribed by the False Claims Act occurred within the district.

**Parties**

5.   Relator Sandy McLauchlin is a citizen and resident of Michigan and resides in Metamora, Michigan.  She served in nursing management at Havenwyck at times relevant.

6.   Relator Christina Varner is a citizen and resident of Michigan and resides in Shelby Township, Michigan.  She served as a charge nurse at Havenwyck at times relevant.

7.   Defendant Universal Health Services, Inc. ("UHS") is a Delaware corporation doing business in Auburn Hills, Michigan.

8.   Defendant Havenwyck Holdings Inc. is a Delaware corporation doing business in Auburn Hills, Michigan.

9.   Defendant Havenwyck Hospital is a subsidiary and affiliate of UHS doing business in Auburn Hills, Michigan.

10.   On information and belief, Defendant Havenwyck Hospital Inc. is a subsidiary and affiliate of UHS doing business in Auburn Hills, Michigan.

**Factual Allegations**

**Background**

11.   Havenwyck Hospital is a private psychiatric and residential facility specializing in psychiatric treatment.

12.   Havenwyck admits children as young as age three (3) with serious psychiatric

or substance abuse problems who often present a danger to themselves and others.

13. Likewise, adult patients are admitted to address acute psychiatric disorders, serious substance abuse, suicide, self-harm and dangers to others.

14. Relators are nurses who were employed at Havenwyck to provide direct patient care and/or to supervise provision of such care by other staff including nurses, psychiatric care specialists, psychiatric care specialists-preceptors, and unit secretaries.

15. Patients admitted at Havenwyck carry a variety of insurances, but based on the Relators' observations, approximately 70-85% at any given time are insured by either Medicare or Medicaid.

16. Based on billing reviewed by Relators, Havenwyck bills many of these patients according to Section 124(c) of Public Law 106-113, the Balance Budget Requirement Act of 1999 ("BBRA"), which implemented a per diem prospective payment system ("PPS") for Inpatient Psychiatric Facilities ("IPFs").

17. Under this system, inpatient psychiatric services provided in a psychiatric hospital are paid by Medicare or Medicaid at a base rate that includes both inpatient operating and capital-related costs (including routine and ancillary services).

18.     This rate allows for patient-level and facility-level adjustments including
        wage index and teaching adjustments and adjustments applicable to rural
        facilities.

19.     The payment for an individual patient is further adjusted for factors such as
        the Diagnosis Related Group classification, age, length of stay, and the
        presence of specified comorbidities.

20.     However, the fact is that once a patient is admitted to a facility billing under
        this system, the facility will be paid a flat, per diem rate for that patient.

21.     Defendants cannot make more money by providing more or better service to
        their patients; indeed, the opposite is true:  they maximize profits by affording
        fewer services at lower costs, given that the rates of reimbursement are flat
        with very few exceptions.[1]

22.     The result in this case is that Defendants routinely fail to provide medically
        appropriate care and have virtually resorted to "locking patients up and
        throwing away the key" until discharge, as pled in detail below.

**False Certification of Need and Overbilling for Admission Workup**

23.     Medicare and Medicaid are not designed to pay for care that is not necessary,
        and so both systems require a physician to certify the need for inpatient

---

[1] For example, Medicare and Medicaid afford reimbursement for electric shock above and beyond the per-diem rate.

psychiatric care and to revisit and recertify the need, where appropriate, at regular intervals.

24.   Laws and regulations provide that the decision to place a Medicare patient in Havenwyck "must" therefore be "furnished by a qualified and licensed practitioner who has admitting privileges at the hospital as permitted by State law, **and who is knowledgeable about the patient's hospital course, medical plan of care, and current condition**." 42 C.F.R. § 412.3(b).

25.   Laws and regulations provide that documentation must support, and the certifying treater must therefore assess, a Medicare admission "based on such complex medical factors as patient history and comorbidities, the severity of signs and symptoms, current medical needs, and the risk of an adverse event." *Id.* at § 412.3(d)(1)(i).

26.   42 C.F.R. § 412.27 states, "A provisional or admitting diagnosis must be made on every inpatient *at the time of admission*, and must include the diagnoses of intercurrent diseases [a/k/a comorbidities] as well as the psychiatric diagnoses."

27.   Regulations further provide that the factors that lead to a particular clinical expectation must be documented in the medical record at or before the time of admission in order to be granted consideration. *Id.* at § 412.3(d)(1)(i).

28.   At Havenwyck these factors are found on the intake forms, which most often

6

are completed inaccurately and perfunctorily by a social worker or a nurse after briefly reviewing documentation from a transferring facility, a process by which portions of that information are simply copied onto Havenwyck intake forms without any assessment of the patient being completed by anyone. (This does not include the minority of patients admitted by way of Walk-In assessments or Direct Admit patients, which follow a different process.)

29.    Applicable law/regulations provide that an admitting physician may not delegate to anyone the obligation to certify medical need. *Id.* at § 412.3(b).

30.    To provide further background information, Havenwyck's psychiatric inpatient facility is set up to provide short-term, crisis intervention treatment to patients with mental health issues who are medically stable.

31.    Havenwyck does not have the qualified staff, medication/pharmacy, personal protection gear, equipment, services or appropriate staffing ratios to adequately treat medically compromised patients.

32.    However, because physicians are routinely making admissions and recertification decisions with an eye toward reimbursement and census, the facility's exclusionary criteria are routinely ignored and patients are admitted with known medical needs that drive up charging codes presented to the Government, although the patient inarguably cannot be managed by this

purely psychiatric facility.

33.    Defendants also allow the intake department to routinely omit pertinent medical information from their reports to admitting doctors and to unit nurses without any consequences.

34.    The result has been increasing trends of inappropriate admissions to the facility, medical emergencies, patient deaths and misuse of public funds.

35.    Specific examples of admissions that were patently made without even cursory attempts to fulfill the mandatory requirements include:

a.    Medicaid patient C.L. was inappropriately admitted on August 27, 2017, after suffering a stroke, was presenting with complete left-sided paralysis, and required medical attention beyond the scope of the psychiatric facility. Medicaid payment for this patient's stay in Havenwyck is fraudulent in that no reasonable treater could have possibly certified this admission.

b.    Medicare patient A.T. was inappropriately admitted on November 10, 2017, with multiple sclerosis and chronic pain requiring the use of a walker.  He was admitted without his multiple sclerosis medication from his home, despite common knowledge that the Havenwyck pharmacy would be unable to provide that medication. Nursing reported this issue immediately to hospital administration.

Nonetheless, the patient went without appropriate medication for four days while he medically destabilized before being discharged to a V.A. hospital on November 14, 2017. On information and belief, based on direct observation of patient care being routinely and consistently billed, Havenwyck financially benefited by receiving Medicare reimbursement for four days at the direct expense and harm of the patient. Medicare payment for this patient's stay in Havenwyck is fraudulent in that no reasonable treater could have possibly certified this admission to this facility.

c.    Medicare/Medicaid patient K.J. was inappropriately admitted on January 9, 2018, without a reliable medical or psychiatric history. She had a guardian that was not contacted for further information, nor was the guardian contacted for treatment or medication consent. K.J. was allowed to sign herself in, despite her guardian's status. K.J. did not attend any groups or participate in active treatment. K.J.'s medical status and history were unclear to Havenwyck Hospital prior to admission and during her hospitalization. There was no factual data collected on behalf of this patient who was herself an unreliable historian. She was found unresponsive in her room during the morning of January 15, 2018, and was pronounced dead soon after she was

discovered.  Medicaid/Medicare payment for this patient's stay in Havenwyck is fraudulent in that no reasonable treater could have possibly certified this admission to this facility absent the information cited above.

d.  Medicaid patient J.Y. was inappropriately admitted on June 27, 2018, despite meeting exclusionary criteria by weighing almost 50 pounds over the facility weight limit of 350 pounds.  She also was known to be violent from injuring staff during her previous stays at the facility. During this stay, she physically attacked Dr. Kodali on July 3, 2018. She was found dead in her room at the facility on July 8, 2018. Medicaid payment for this patient's stay in Havenwyck is fraudulent in that no reasonable treater could have possibly certified this admission to this facility.

e.  Medicare patient E.Y. was inappropriately admitted on August 5, 2018. The intake department had reported that the 78-year-old had no medical risk factors.  The unit nurse discovered later that the patient had a history of Diabetes Mellitus II, Hypercholesterolemia, Hypertension, Hernia, Urinary Incontinence, Obesity, Congestive Heart Failure with +4 pitting, edema in bilateral ankles, weakness requiring the use of a wheelchair and assistance with activities of daily living ("ADLs").

10

Administration admitted that E.Y. had been inappropriately admitted. However, rather than lose Medicare money, the facility placed the patient on direct observation around the clock for medical risk, by unlicensed staff with no medical or ADL training, and she was kept for the average length of stay.  On information and belief, Medicare was billed and upcoding charges were applied for psychiatric inpatient care that was inappropriate, negligent and caused the patient to medically decline during her length of stay.

f.   Medicaid patient J.C. was inappropriately admitted on or about September 7, 2018.  He was wheelchair bound, blind in one eye and required full assistance with ADLs.  The admitting physician knew or should have known that he was wheelchair bound, a fall risk and required full assistance with ADLs.  Instead of foregoing Medicaid payments, however, J.C. was placed on direct observation for medical risk by unlicensed staff with no medical or ADL training, instead of being transferred to an appropriate facility that could provide adequate care to him.

g.   Medicaid patient S.V. was inappropriately admitted on September 25, 2018, despite meeting Defendants' own exclusionary criteria, of which the certifying physician knew or should have known, such as liver

11

failure, an unknown cardiac history with stents, and a T-cell count below 200 (the most recent level was around 50) that was indicative of AIDS and severe immunosuppression, i.e., a high risk of acquiring infections that could lead to death.  This pertinent medical information was provided in the paperwork faxed to the Defendants' intake department from the transferring facility for review prior to admission.  However, it was completely ignored including by the admitting psychiatrist. After hospital administration and intake were made aware of this, they chose to keep the patient at the facility, instead of transferring him to the hospital where his specialists were located, per his request. S.V. was discharged on September 28, 2018, after receiving inadequate medical care due to the inability of Defendants to follow his conditions.

h.   Medicaid patient G.B. was inappropriately admitted on January 19, 2018.  His condition should have been discussed with medical staff and/or a director of nursing because he met exclusionary criteria (which prompts consultation with medical staff/nursing), as he had a diagnosis of MRSA and presented a high risk of infecting others, with an open abscess and an elevated white blood cell count.  This oversight put this patient and others at risk.  Medicaid payment for this patient's stay in

Havenwyck is fraudulent in that no reasonable treater could have possibly certified this admission to this facility.

36.    Such health crises are illustrative only and provided as examples of a trend that has been ongoing.

37.    Within twenty-four (24) hours, patients are supposed to receive a psychological workup from a trained physician, and in no case is this permitted to occur more than sixty (60) hours after admission. 42 CFR § 412.27(c)(2).

38.    On billing to Havenwyck patients, such initial examinations are billed to Medicare and/or Medicaid using Current Procedural Terminology ("CPT") codes as maintained by the American Medical Association, i.e., they are medical procedural codes.

39.    Code 99222 refers to a 50-minute, comprehensive medical assessment, with the following summary:

| Components Required: 3 of 3 | 99221 | 99222 | 99223 |
|---|---|---|---|
| **History & Exam** | | | |
| Detailed or comprehensive | ● | | |
| Comprehensive | | ● | ● |
| | | | |
| Straightforward or low | ● | | |
| Moderate | | ● | |
| High | | | ● |
| **Presenting Problem (Severity)** | | | |
| Low | ● | | |
| Moderate | | ● | |
| High | | | ● |
| **Typical Time: Bedside/Floor/Unit** | 30 | 50 | 70 |

https://www.cgsmedicare.com/partb/mr/pdf/99222.pdf.

40.    The reality is that Havenwyck physicians spend very little time with patients in these assessments, much less than is actually billed.

41.    Representative examples of this consistent pattern cited for illustration include:

a.    Medicaid Wayne County patient S.T., who was admitted on November 1, 2018 at 02:15 and was seen by Dr. Kodali (medical director) for initial psychiatric evaluation on November 1, 2018 for less than four minutes, from 15:48:00 to 15:51:30.

b.    Medicaid Wayne County patient K.F., who was admitted on October 10, 2018 at 18:00 and was seen by Dr. Kodali for initial psychiatric evaluation on October 11, 2018 for less than seven minutes, from 14:31:50 to 14:38:00.

14

     c.     Medicaid Genesee County patient L.T., who was admitted on October 11, 2018 at 03:00 and was seen by Dr. Kodali for initial psychiatric evaluation on October 11, 2018 for less than six minutes, from 14:38:18 to 14:43:43.

     d.     Medicare Inpatient patient G.D., who was admitted on October 17, 2018 at 05:30 and was seen by Dr. Kakar for initial psychiatric evaluation on October 17, 2018 for less than ten minutes, from 12:37:12 to 12:46:50.

     e.     Medicaid Genesee County patient S.H., who was admitted on October 19, 2018 at 16:30 and was seen by Dr. Kakar for initial psychiatric evaluation on October 20, 2018 for just under ten minutes, from 16:08:55 to 16:18:45.

     f.     Medicaid Wayne County patient C.A., who was admitted on November 1, 2018 at 14:45 and was seen by Dr. Kodali for initial psychiatric evaluation on November 2, 2018 for less than nine minutes, from 08:48:15 to 08:56:20.

42.    Relators have witnessed that the above examples are typical, and not outliers, throughout Havenwyck and this has been true for six years or longer.

43.    On information and belief, based on review of actual patient billing documents from the Centers for Medicare and Medicaid Services ("CMS"),

Havenwyck presents a bill for $250.00 to the U.S. Government for such intake "examinations," i.e., under CPT Code 99222.

44. The presentation of this billing occurs within 30-60 days after the care is provided, based on review of CMS documentation.[2]

45. Due to Havenwyck participating in "special payment" arrangements provided under law, a lesser amount is considered "approved," i.e., $137.64, and Havenwyck has been paid $107.91 for such supposed detailed admissions evaluations that are, in fact, so cursory as to fail to identify such factors as weight, life threatening diagnoses, and existing prescriptions.

### Fraudulent Re-Certification

46. Continuing the pattern of minimal care, Defendants house, rather than treat, Medicare and Medicaid patients throughout their stay.

47. Although a "physician certification or recertification statement," i.e., the documentation that permits ongoing retention of Medicare or Medicaid patients after admission, must be based on a current evaluation of the patient's condition, physicians in fact do not engage in bona fide evaluations of patients' conditions, but instead create paperwork falsely

---

[2] Plaintiff-Relators do not have access to each of the bills presented to the U.S. Government because they are controlled by Defendants and are considered confidential. However, based on the known dates of service, patient names, locations of service (i.e., at Havenwyck Hospital), provider names, and based on exemplars of actual billing reviewed and in the possession of Plaintiff-Relators, they would be able to target the exact date of presentment for each of the patients identified in this pleading, with straightforward discovery.

claiming to have done so.

48.    Specifically, Havenwyck's Medicare certification/recertification paperwork is a blank, pink form.  As a matter of policy and practice, this form typically remains blank throughout the patient's stay at Havenwyck, i.e., until the patient is discharged.

49.    After discharge, a staffer from utilization review or medical records backfills the "correct" dates that certification or recertification *was supposed to have occurred* on the form, after the fact.

50.    Meanwhile, i.e., during the patient's actual stay, the physicians are signing a blank form documenting that they have completed the certification process, when in reality there is no activity on that date and the information is filled in after the fact.

51.    Relator McLauchlin has attended so-called "Flash meetings" in which Havenwyck administration has urged "reconsideration" of decisions to discharge patients who continue to have lifetime Medicare/Medicaid benefits or – conversely – to prematurely discharge individuals whose lifetime benefits have lapsed.

52.    Specific instances of patients affected by this routine process include, by way of illustration:

    a.    Medicare patient S.D., who was due for a thirty-day recertification by

a psychiatrist on September 7, 2018:  As of September 25, 2018, the psychiatrist still had completed the recertification.

b.    Medicare patient K.J., who was hospitalized from January 9, 2018 through January 15, 2018 with no Medicare certification completed in real time (and, any that exists thereafter would be backdated).[3]

c.    Medicare patient B.S., who was hospitalized from July 17, 2018 through September 6, 2018:  Medicare certification and recertification were not completed and Relator(s) witnessed the blank form with dates due in her chart, post-discharge.

d.    Patient G.N., who was admitted on October 31, 2018 and was due for recertification on November 11, 2018:  As of November 14, 2018, the form remained incomplete.

e.    Medicare patient T.T., who was admitted to the facility on November 16, 2018:  Her first recertification was due November 27.  However, the form had been pre-signed by psychiatrist Dr. Singhal with the date stamp left blank, to be dated whenever the hospital wanted it to look appropriate.

---

[3] Medical records at Havenwyck are still nearly all paper documentation with an electronic medical records portion only furnishing a physician order entry process and medication administration program.  Relators have witnessed teams ordered to scrub files upon notice of audits, e.g., to backdate and/or complete paperwork to fraudulently reflect facts supportive of chosen outcomes. Havenwyck uses such known falsification of documents to prevent anyone involved in oversight from discovering this fraud.

53.    On information and belief, utilization review staff determine ongoing approval for patient stays at Havenwyck, while physicians are there to sign what they are told to sign irrespective of facts.

54.    Relators have observed that these non-treaters glean whatever relevant criteria from the chart is available, and fill in blanks for recertification on their own, creating documentation to prolong patient stays based on hearsay from non-physicians, unreliable information/reports, or their own ad-libbing when there are too few criteria documented in the patient record to obtain the approval needed for continued stay.

55.    In short, when recertification becomes due on a Medicare patient, a physician is obliged to certify that inpatient psychiatric hospital services furnished since the previous certification were medically necessary and "reasonably…expected to improve the patient's condition" (or were for diagnostics). 42 CFR § 414.14. They must also certify that "The patient continues to need, on a daily basis, active treatment furnished directly by or requiring the supervision of inpatient psychiatric facility personnel." *Id.*

56.    However, at Havenwyck, such requirements are treated as an empty exercise and are completed, if at all, fraudulently.

**Treating without Treatment Plans**

57.    Regulations establish that in order to be approved for hospitalization,

psychiatric patients must be treated pursuant to an individualized treatment plan.

58.    For example, 42 CFR § 412.27(c)(3) states that this plan must be written and must address "substantiated diagnosis; short-term and long-term goals; the specific treatment modalities utilized; the responsibilities of each member of the treatment team; and adequate documentation to justify the diagnosis and the treatment and rehabilitation activities carried out."

59.    Interdisciplinary Treatment Plan Meetings are required to be held for each patient within seventy-two (72) hours of admission and then every seven (7) days thereafter, up until the patient's discharge date.

60.    In reality, these treatment plan meetings almost never take place for any patient, except for when regulatory surveyors are visiting the facility.

61.    At all other times, it is common practice hospital-wide for representatives from each department to fraudulently sign-off on participation in developing a treatment plan, when no such effort has been undertaken.

62.    The actual process typically involves a passage of paperwork among treaters, after the fact.

63.    Representative examples supplied for illustration of this widespread practice include:

a.    Medicaid patient S.K. was admitted on August 14, 2018 and discharged

on August 23, 2018.  As of August 24, 2018, the interdisciplinary master treatment plan remained incomplete.  The date, time stamps and the patient participation section were incomplete for the conference that was due on August 17, 2018, and there was no nurse signature.

b. Medicaid patient H.D. was admitted on November 5, 2018.  As of November 7, 2018, the interdisciplinary master treatment plan was signed by the social worker, recreational therapist and patient and dated November 8, 2018.  The document stated that the conference was held on November 8, 2018, but no time stamp was given, it contained no signatures from the psychiatrist or nurse, and the patient participation section was incomplete.

c. Medicaid patient C.A. was admitted on November 1, 2018.  As of November 7, 2018, the interdisciplinary master treatment plan was signed by the patient, social worker, recreational therapist and midnight nurse.  The date, time stamps, and the patient participation section were incomplete for the conference due on November 4, 2018, and there was no psychiatrist signature.

d. Healthy Michigan patient A.J. was admitted on October 27, 2018 and discharged on November 8, 2018.  The ten-day master treatment plan update was due on November 6, 2018, and there was no nurse present

21

at the conference that was documented to have taken place on November 6, 2018 at 11:50. As of November 11, 2018, the master treatment plan update remained largely incomplete, including the patient participation section, and it was missing the nurse's signature.

e. Healthy Michigan patient N.B. was admitted on October 31, 2018. As of November 6, 2018, the interdisciplinary master treatment plan was signed by the patient, social worker, midnight nurse and recreational therapist, but the date, time stamps and patient participation sections were incomplete for the conference that was due on November 3, 2018, and there was no psychiatrist signature.

f. Medicaid patient J.S. was admitted on November 3, 2018. As of November 6, 2018, the interdisciplinary master treatment plan had been signed by all treatment team members, but there was no team conference held. The social worker alone reviewed the document with the patient.

g. Medicaid patient K.F. was readmitted on November 4, 2018. As of November 7, 2018, the interdisciplinary master treatment plan had been signed by all treatment team members, but there was no team conference held. The social worker alone reviewed the document with the patient.

h.   Medicaid patient S.T. was admitted on November 1, 2018. As of November 6, 2018, the interdisciplinary master treatment plan had been signed by the social worker, recreational therapist and midnight nurse, but the date, time stamps and patient participation sections were incomplete for the conference due on November 4, 2018, and there was no psychiatrist signature, nor patient signature.

i.   Medicaid patient S.H. was admitted on October 19, 2018 and discharged on November 9, 2018. As of November 12, 2018, both interdisciplinary master treatment plan updates were largely incomplete and missing the psychiatrist's signatures. The first one was due on October 29, 2018 and the second one was due on November 8, 2018.

64.   None of the above were mere lapses or delays in signing paperwork, but reflect the specific and consistent observed reality of Relators that there is no actual, individualized treatment plan in place for Medicare and Medicaid patients in general. In short, the above patients are exemplars of a larger pattern and practice of fraud.

### Falsification of Group Treatment

65.   Medicaid coverage in inpatient psychiatric hospitals like Havenwyck is dependent upon active treatment being provided at the medically necessary level of care.

23

66.  42 CFR § 412.27(d)(4)-(6) requires that a suite of nursing, social and therapeutic treatments be offered.

67.  Havenwyck and its physicians regard the "medically necessary level of care" for Medicaid and Medicare patients to include supportive psychotherapy and/or group therapy, which are ordered for various patients.

68.  In reality, because of staffing levels and lack of treatment plans, Havenwyck does not reliably offer these services.

69.  No substance abuse group therapy has been offered or provided to adult patients whatsoever since a couple months prior to the death of Dr. John Knisely on June 1, 2016 to present, despite the facility's still advertising itself as a "licensed substance abuse treatment facility, offering two specific substance abuse treatment programs."

70.  As far as licensed staff is aware, Medicare and Medicaid patients who suffer from substance abuse issues are provided the exact same generic care and treatment options as patients who are not.

71.  As a result, substance abuse issues remain untreated and unaddressed in affected patients. Any additional charges incurred for such patients are fraudulent, as there is no such program.

72.  A non-exhaustive list of Medicare and Medicaid patients who received no or little licensed group therapy sessions during their stay is provided below.

Exact attendance dates can be found in their medical records, which are in the Defendants' possession:

a.  CMH Carelink patient R.C. was admitted on August 27, 2017, despite a diagnosis of a severe seizure disorder documented in the transferring facility's paperwork provided to Havenwyck's Intake Department, which rendered her an inappropriate admission to the facility.  Instead of being transferred to an appropriate facility upon nursing's report to hospital administration and doctors, she was "housed" at the facility for an average length of stay to allow for Medicaid reimbursement, which placed the patient at severe medical risk.  R.C. displayed symptoms of petit mal seizure activity multiple times almost every day.  R.C. was placed on direct observation for severe seizure risk by unlicensed staff with no medical background or training.  She spent most days in bed, asleep from the postictal state, and unable to participate in most of the treatment modalities provided, including group therapy and many of the supposed physician "evaluations" claimed.

b.  Patient S.K. did not receive the majority of group therapy sessions during her stay from August 14, 2018 to August 23, 2018.

c.  Patient R.H. did not receive the majority of group therapy sessions during his stay from January 7, 2018 to April 17, 2018.  On information

and belief, the same was true during his stay from December 9, 2017 to December 28, 2017.

d.   Patient S.D. did not receive the majority of group therapy sessions during her stay from August 10, 2018 to October 5, 2018.

e.   Patient S.H. did not receive the majority of group therapy sessions during her stay from October 19, 2018 to November 9, 2018.

f.   Patient J.L. did not attend the majority of group therapy sessions during his stay from October 27, 2018 to November 2, 2018.

g.   Patient S.T. did not attend the majority of group therapy sessions during her stay initiated on November 1, 2018.

73.   Because, as set forth above, patients are not receiving meaningful physician care or individualized care plans, and as set forth in the above paragraph, patients also are not receiving even group therapy, the "care" Medicare and Medicaid patients are routinely receiving is assistance with daily living; these patients are being warehoused rather than treated medically.

74.   Moreover, licensed group therapy sessions are routinely oversized with more than twelve patients per licensed therapist, and there is no process at the facility for adding an additional therapist when the largest units are at full census. Programming logs on each unit show the group attendance rates. Below are a few examples:

a.     On October 1, 2018, on Unit E South:  RT Group at 9 a.m. had 17 patients; RT Group at 11 a.m. had 16 patients; RT Group at 1 p.m. had 16 patients; and Social Work Group at 2 p.m. had 15 patients.

b.     On October 23, 2018, on Unit E South:  RT Group at 9 a.m. had 18 patients; RT Group at 11 a.m. had 17 patients; RT Group at 1 p.m. had 16 patients; and Social Work Group at 2 p.m. had 16 patients.

c.     On October 26, 2018, on Unit E South:  RT Group at 9 a.m. had 17 patients; RT Group at 11 a.m. had 16 patients; and RT Group at 1 p.m. had 16 patients.

d.     On October 29, 2018, on Unit B1:  RT Group at 9 a.m. had 18 patients.

e.     On October 30, 2018, on Unit B1:  RT Group at 9 a.m. had 15 patients; and Social Work Group at 10 a.m. had 15 patients.

f.     On October 31, 2018, on Unit B1:  RT Group at 9 a.m. had 21 patients; and RT Group at 1:30 p.m. had 16 patients.

g.     On November 1, 2018, on Unit B1:  RT Group at 9 a.m. had 18 patients; and Social Work Group at 10 a.m. had 15 patients.

h.     On November 2, 2018:  RT Group at 9 a.m. had 18 patients; and Social Work Group at 10 a.m. had 17 patients.

i.     On November 5, 2018, on Unit B1:  RT Group at 9 a.m. had 19 patients; and RT Group at 1:30 p.m. had 15 patients.

j.     On November 6, 2018, on Unit B1:  RT Group at 9 a.m. had 18 patients.

k.     On November 7, 2018, on Unit B1:  RT Group at 9 a.m. had 18 patients; Social Work Group at 10 a.m. had 18 patients; and RT Group at 11 a.m. had 17 patients.

l.     On October 26, 2018, there was not enough staff to run all RT groups on A Unit, and, therefore, one group of patients got one group, while the rest got none.

75.    Programming logs on each unit are supposed to keep track of group attendance rates as required by CMS guidelines.

76.    Significant portions of the programming logs have been left blank, which is out of compliance with CMS regulations and leaves attendance for the following session dates and times unknown:

a.     On Unit E South:  On October 6, 2018, RT Groups at 9 a.m. and 1 p.m.; on October 20, 2018, RT Group at 1 p.m.; on October 22, 2018, Social Work Group at 2 p.m.; and on October 27, 2018, Med. Education Group at 11 a.m., RT Group at 1 p.m. and Social Work Group at 2 p.m.; on October 28, 2018, RT Group at 9 a.m., Med. Education Group at 11 a.m.

b.     On Unit B1:  On October 24, 2018, Social Work Group at 10 a.m.; on October 26, 2018, RT Groups at 9 a.m., 11 a.m. and 1:30 p.m.; on

October 27, 2018 and October 28, 2018, RT Group at 9 a.m.; and on

November 4, 2018, RT Group at 9 a.m. and Med. Education at 11 a.m.

### Falsification/Up-Coding of Patient-Physician Encounters

77. Havenwyck and its providers further regard the "medically necessary level of care" to include daily physician evaluations by a psychiatrist, which may include supportive psychotherapy, medication management and discharge planning.

78. However, in practice those physician evaluations are pro forma only; they exist on paper, but in reality consist of brief encounters lasting under five minutes in length.

79. The psychiatrists routinely involved in bare minimum patient interactions include: Davinder Kakar, M.D.; Yatinder Singhal, M.D.; and Medical Director of Adult Programs, Srinivasa Kodali, M.D., each of whom regularly has the largest patient caseloads and holds seniority over other psychiatrists at the facility.

80. Each of the three doctors listed above in general carries a caseload of around thirty patients at any given time.

81. If each patient were to be seen for the minimum time of sixteen minutes for daily evaluation and management, this would equate to eight hours per day of face-to-face patient care time. (This would not include the increased amount

of time for initial evaluations of new patients.)  When meeting CMS requirements and completing all other basic tasks such as dictation, documentation, phone calls, communicating to staff, traveling from unit to unit, using the restroom, logging into computers, etc., it is estimated that the doctors would have to be at the facility for over ten hours on a typical day.

82. The Relators have observed that these doctors are in fact on the premises for less than half that amount of time as a matter of course.

83. Based on billing made available to Relators, Havenwyck bills patients for 25-minute encounters with physicians each day of their stay as a matter of practice.

84. In doing so, they use CPT Code 99232.

85. This code refers to ongoing hospital care above a moderate level of complexity and based on a patient not responding to care or otherwise presenting a complicated condition.  The code is summarized as follows:

### Subsequent Hospital Care (New/Established Patients)

| Components Required: 2 of 3 | 99231 | 99232 | 99233 |
|---|:---:|:---:|:---:|
| **History & Exam** | | | |
| Problem Focused | ● | | |
| Expanded problem focused | | ● | |
| Detailed | | | ● |
| **Medical Decision Making** | | | |
| Straightforward or low | ● | | |
| Moderate | | ● | |
| High | | | ● |
| **Presenting Problem (Severity)** | | | |
| Stable/recovering/improving | ● | | |
| Responding inadequately/minor complication | | ● | |
| Unstable/significant complication/new problem | | | ● |
| **Typical Time: Bedside/Floor/Unit** | 15 | 25 | 35 |

https://www.cgsmedicare.com/partb/mr/pdf/99232.pdf.

86.  As reflected in the above chart, the evaluations by staff are reflected on patient bills as 25 minutes in length, or one level higher than the minimum code of 99231 (15 minutes).

87.  In fact, however, Medicare and Medicaid are routinely and generally billed for "visits" that last only ***one or two minutes***.

88.  Daily physician "evaluations" for Medicare and Medicaid patients lasting under five minutes were observed, by way of example only:

a.  **On September 8, 2018, evaluations by Dr. Kakar:**

i.  CMH Carelink patient B.C. was seen for two minutes, from 13:08-13:10; CMH Carelink patient M.D. was seen for one

31

minute, from 13:10-13:11; Medicaid Genesee County patient S.S. was seen for two minutes, from 13:11-13:13; and Healthy MI Macomb patient S.C. was seen for two minutes, from 13:19-13:21.

b.  **On September 9, 2018**, **evaluations by Dr. Singhal:**

    i.    Medicaid Macomb patient L.R. was seen for two minutes, from 15:29-15:31; Medicaid Oakland County patient H.N. was seen for two minutes, from 15:33-15:35; Medicaid Carelink patient A.P. was seen for two minutes, from 15:36-15:38; Medicaid Carelink patient S.K. was seen for two minutes, from 15:38-15:40; and Healthy MI Carelink patient K.M. was seen for two minutes, from 15:41-15:43.

c.  **On October 10, 2018 and October 11, 2018:**

    i.    Patient A.M. was not seen at all despite his billing, on information and belief.  Indeed, the patient was discharged with no live examination, i.e., by order over the telephone.

d.  **On  October 11, 2018**, **evaluations by Dr. Kodali:**

    i.    Medicaid Carelink patient C.A. was seen for just under three minutes, from 14:27 to 14:30; and Healthy MI Lapeer patient D.L. was seen for less than three minutes, from 14:24 to 14:27.

    e.    **On October 12, 2018, evaluations by Dr. Kodali:**

        i.    Medicaid Genesee County patient L.T. was seen for less than three minutes, from 13:06 to 13:08; Healthy MI Lapeer patient D.L. was seen for less than three minutes, from 13:09 to 13:11; Medicaid Carelink patient C.A. was seen for less than two minutes, from 13:11 to 13:12; and Medicaid Wayne County patient K.F. was seen for less than three minutes, from 13:13 to 13:15.

    f.    **On October 16, 2018, evaluations by Dr. Kodali:**

        i.    Medicaid Genesee County patient L.T. was seen for four minutes from 11:40 to 11:44; and Medicaid Wayne County patient K.F. was seen for less than two minutes, from 11:50 to 11:51.

    g.    **On October 20, 2018, evaluations by Dr. Singhal:**

        i.    Medicaid Wayne County patient L.F. was seen for less than two minutes, from 14:04 to 14:05; Medicaid Wayne County patient A.N. was seen for two minutes, from 13:52 to 1354; Medicaid Wayne County patient C.D. was seen from two minutes, from 14:18 to 14:20; Medicaid patient S.L. was seen for four minutes, from 14:06 to 14:10; and Medicaid Northern Lakes patient A.V. was seen for two minutes, from 14:11 to 14:13.

h. **On October 20, 2018, evaluation by Dr. Kakar:**

    i.    Medicaid Macomb patient B.C. was seen four minutes, from 15:57-16:01.

i. **On October 21, 2018 evaluations by Dr. Singhal:**

    i.    Medicaid Wayne County patient L.F. was seen for just under two minutes, from 13:11 to 13:12; Medicaid Wayne County patient A.N. was seen for one minute, from 13:23 to 13:24; Medicaid Wayne County patient C.D. was seen for two minutes, from 13:14 to 13:16; Medicaid patient S.L. was seen for three minutes, from 13:19 to 13:21; and Medicaid Northern Lakes patient A.V. was seen under two minutes, from 13:17 to 13:18.

j. **On October 25, 2018, evaluations by Dr. Singhal:**

    i.    Medicaid Wayne County patient C.D. was seen just over two minutes, from 12:11 to 12:13; and Healthy MI Wayne County patient K.V. was seen for under three minutes, from 11:58 to 12:01.

k. **On October 25, 2018, evaluations by Dr. Kakar:**

    i.    Medicare Inpatient patient D.M. was seen for two minutes, from 13:21 to 13:23; and Medicaid Genesee County patient S.H. was seen for four minutes, from 13:16 to 13:20.

l.      **On October 26, 2018, evaluations by Dr. Kakar:**

     i.      Medicare Inpatient patient D.M. was seen for just under three minutes, from 12:43 to 12:45; and Medicaid Genesee County patient S.H. was seen for four minutes, from 12:38 to 12:42.

m.      **On November 1, 2018, evaluations by Dr. Kakar:**

     i.      Medicare Inpatient patient D.M. was seen for three minutes, from 12:32 to 12:35; Medicaid Genesee County patient S.H. was seen for under three minutes, from 12:37 to 12:40; and Healthy MI Wayne County patient N.B. was seen for three minutes, from 12:35 to 12:37.

n.      **On  November 1, 2018, evaluation by Dr. Singhal:**

     i.      Healthy MI Wayne County patient A.J. was seen for two minutes, from 12:02 to 12:04.

o.      **On November 2, 2018, evaluations by Dr. Kakar:**

     i.      Medicare Inpatient patient D.M. was seen for one minute, from 08:45 to 08:46; Medicaid Genesee County patient S.H. was seen for under four minutes, from 08:41 to 8:44; and Healthy MI Wayne County patient N.B. was seen for two minutes, from 08:46 to 08:48.

p.    **On November 2, 2018, evaluation by Dr. Singhal:**

    i.    Healthy MI Wayne County patient A.J. was seen for a little over a minute, from 13:06 to 13:07.

q.    **On November 2, 2018, evaluations by Dr. Kodali:**

    i.    Medicaid Wayne County patient S.T. was seen for one minute, from 13:34 to 13:35; Medicare Inpatient patient J.L. was seen for one minute, from 13:37 to 1338.

r.    **On November 7, 2018, evaluations by Dr. Kakar:**

    i.    Medicaid Genesee County patient S.H. was seen for one minute, from 12:42 to 12:43; Healthy MI Wayne patient N.B. was seen for just over one minute, from 12:43 to 12:44; and Medicaid Wayne County patient C.A. was seen for two minutes, from 12:44 to 12:46.

s.    On November 7, 2018, the following patients were seen by Dr. Kodali around 13:00 on a "drive-by" basis while the patients were partaking in other activities in bedrooms, group rooms, hallways and other public areas, sometimes within earshot of a roommate or peers: Medicare patient M.R. was seen in a group room; Medicaid Wayne patient K.F. was seen while in a meeting with a social worker; and Medicaid Macomb patient J.S. was seen while in a bedroom.

89.  On information and belief, based on review of patient medical billing, physicians at Havenwyck present a bill for $110.00 to the U.S. government for such care, i.e., under CPT Code 99232.

90.  Due to Havenwyck participating in "special payment" arrangements provided under law, a lesser amount is considered "approved," i.e., $72.15, and Havenwyck and/or its affiliated physicians have been paid $56.57 for these supposed 25-minute "examinations" that in fact are momentary encounters.

91.  Apart from these routine drive-by "examinations," Havenwyck consistently bills for patient examinations or consultations without even seeing the patients.

92.  Doctors observed to be involved in this fraudulent activity on a daily basis, hospital-wide, include Asha Patel, M.D. and Jayakar Reddy, M.D.

93.  Representative examples provided for sake of illustration of the wider pattern and practice include:

a.  Medicaid patient C.M. who was admitted on September 2, 2018 and was billed for a consultation date on September 8, 2018 with Dr. Patel.

b.  Medicaid patient H.D. who was admitted on November 5, 2018 and was billed for a consultation date on November 9, 2018 with Dr. Reddy.

c.  Medicaid patient L.R. who was billed for a consultation date on September 9, 2018 with Dr. Reddy.

d.   CMH patient R.G. who was billed for a consultation date on September 9, 2018 with Dr. Reddy.

e.   Medicaid patient J.S. who was admitted on November 3, 2018 and was billed for a consultation date on November 5, 2018 with Dr. Reddy.

94.   At times, nurses need to call medical doctors to obtain verbal medication orders to treat simple, common ailments, such as a headache or heartburn.

95.   Jayakar Reddy, M.D. orders a consult to be submitted for billing with every such phone call, explicitly to increase insurance reimbursement, even in cases when a patient just needs over-the-counter medication such as Tylenol and the headache has completely subsided thereafter.

96.   Oftentimes, doctors Asha Patel, M.D. and Jayakar Reddy, M.D. appear distracted during patient consults and forget to enter orders for treatment that they agreed to prescribe to the patient.  When nursing follows up to obtain verbal orders to correct the oversight, the doctors demand that additional consults be presented for billing to the Government.

97.   Asha Patel, M. D. and Jayakar Reddy, M. D. are well-known at the facility for ordering Vitamin D-level laboratory tests on almost every patient as a means of guaranteeing follow-up consults for abnormal lab results, since Vitamin D levels are deficient in most individuals.

98.   They also have almost never provided Vitamin D supplement prescriptions or

education to patients upon discharge, reflecting on their true view of these issues for patient welfare.

99.   Representative patient examples of this ubiquitous practice include:

   a.   Medicaid patient H.D. who was admitted on November 5, 2018 and was (on information and belief) charged for a Vitamin D and Abnormal Lab consult on November 8, 2018, when Relators know that Dr. Reddy did not actually see the patient.

   b.   Medicaid patient K.F. who was admitted November 4, 2018 and was (on information and belief) charged for a Vitamin D consult on November 7, 2018, when Relators know that Dr. Reddy did not actually see the patient.

**Havenwyck Finds Excuses to Hold Patients**

100.   Havenwyck cannot bill Medicare or Medicaid for patients it has discharged, so it engages through its agents in a series of schemes to prolong the stays of these patients, fraudulently.

101.   A very typical tool used to extend the stay of adult Medicare and Medicaid patients is reckless, aggressive, and abrupt removal from scheduled medication upon admission, in harsh contradiction to best practices and medical science.

102.   For example, most patients are removed from existing treatment regimens and

started on a completely different regimen almost immediately upon admission.

103.   Adult patients are rarely weaned off of medication, and facility psychiatrists for adult inpatient units usually refuse to communicate with or follow the recommendations of outpatient psychiatrists who have been carefully adjusting the patient's medication for years.

104.   Nearly all patients are started on scheduled psychotropic medication at the facility within the first day of seeing a psychiatrist, including patients who do not appear to require inpatient care at all.

105.   An example of this would be patients who have absolutely no history of depression, suicidal behavior or any other mental health issues who are admitted for making an isolated statement expressing hopelessness in response to a legitimately upsetting personal situation, such as a traumatic sudden death of a loved one, or other serious life stressor.  By way of example:

a.      Medicare patient S.D. who was admitted on August 10, 2018 and was not discharged until October 5, 2018, simply because she was awaiting guardianship and placement during her stay. She was admitted for bizarre behavior and a decline in mental status after a recent motor vehicle accident that involved a traumatic brain injury.  She rarely left her room due to confusion, anxiety and noncompliance.  She attended

very few group therapy sessions and refused many physician visits during her stay. There were no significant changes in her mental status during this waiting period; she was coherent and appeared to be at her new baseline since the accident. She was "housed" for an extended period of time while the facility benefitted from increased Medicare reimbursement. Many of her lifetime inpatient days covered by her insurance were used up by the facility, which could cause her to be denied treatment later in life when she is in crisis.

b.    Patient B.S. who was admitted on July 17, 2018 and discharged September 6, 2018. She was awaiting placement and no longer met the criteria of continued inpatient hospitalization per CMS guidelines, for the majority of her stay.

c.    Healthy Michigan patient A.C., who was 29 years-old, was admitted on November 15, 2018, supposedly for suicidal ideation and depression. She had no history of mental health issues, no history of prior mental health treatment and was not on any psychotropic medication. She continually denied suicidal ideation during her stay, so Dr. Kakar, who sees his patients for perhaps a few minutes per day, documented her as presenting with elated mood, grandiose demeanor and hyperverbal speech. He did not discharge her until November 26,

2018.  Staff present minute by minute never witnessed any of the symptoms used to justify this admission.

d.  Medicaid patient A.P., who was 31 years-old, was admitted on November 20, 2018 for suicidal ideation after giving birth to a stillborn baby one month prior.  She had no history of mental health issues, no history of prior mental health treatment and was not on any psychotropic medication.  She admitted to grieving the loss of her baby, but denied any suicidal plans.  Nevertheless, she was held on an inpatient basis for four days.

106.  Once admitted, patients are chemically restrained using medications that are not necessarily prescribed upon an actual physician's examination.

107.  Rather, several of the physicians at Havenwyck have standing orders for new/unadmitted patients to be started on drugs, ***despite never having been examined***, since these physicians do not want the bother of being contacted while on call.

108.  Very specifically, facility physicians typically order benzodiazepine and an antipsychotic medication for nearly every newly admitted patient, regardless of appropriateness or need of these neuroleptics, and sometimes despite the admitting R.N.'s report to the physician (and the fact that the physician has never seen the patient whatsoever).

109. Due to these "default" orders, neuroleptics are being prescribed and administered to nearly every adult patient on a wholesale basis. These drugs are addictive in nature and have been shown to cause many adverse side effects for patients at Havenwyck Hospital, including severe allergic and adverse reactions.

110. Furthermore, these medications frequently are administered without the consent of the patients or their guardians.

111. In short, patients are being chemically restrained without proper justification and in violation of the Michigan Mental Health Code as a means of extending stays on Medicare or Medicaid time.

112. Many patients who resist an unexplained regimen of unwanted drugs, prescribed after little or no encounter with a physician, are documented to be oppositional and argumentative, including if they ask questions or disagree with the need to be on medication or to change medications suddenly.

113. Such "resistance" is ordered to be recorded, fraudulently, to justify prolonged hospitalization.

114. Meanwhile, when utilization review staff relays to a psychiatrist that insurance is not approving further hospitalization, Relators have observed Havenwyck treaters change the medication or dosage as a means to justify the need for continued monitoring for any side effects in order to get more days

43

approved to increase reimbursement.

115. This is, in fact, a primary means of "reconsidering" discharge decisions after "Flash meetings," as referenced above.

116. Specific dates, names and other details of patients affected by the foregoing include, provided for illustration only include:

    a.    Healthy MI Carelink patient D.P. who was transferred to a local emergency room for medication side effects on January 10, 2017, and diagnosed with rhabdomyolysis.

    b.    Medicare patient J.W. who suffered from medication adverse effects (the patient's CPK level on October 5, 2017 was 2308) after receiving multiple doses of multiple antipsychotics.

    c.    Medicaid patient D.W. who suffered from a change in mental status and was transferred to a local emergency room and was diagnosed with an intracranial bleed on August 14, 2017.

    d.    Medicaid patient M.Q.-S. who was admitted multiple times and was catatonic, unable to participate in treatment, and was transferred to a local emergency room for change in mental status and returned with a diagnosis of dehydration on March 6, 2017.

    e.    UBH patient M.M. who suffered from severe side effects of medications administered, ordered by a physician on an as-needed basis

prior to knowing anything about the patient (i.e., Haldol, which is ordered for nearly ALL patients), on November 8, 2017.

f.  Healthy MI Oakland patient A.G. who received dosages of psychotropics without informed consent.

g.  Medicare patient K.J. who received dosages of psychotropics without informed consent.

## Count I — False Claims Act Violations

117. Relators hereby incorporate and re-allege the previous paragraphs as if fully set forth herein.

118. In submitting false, misleading, overstated and/or unnecessary claims to the Government, Defendants falsely certified, expressly and/or implicitly, compliance with all Medicaid and Medicare rules and regulations.

119. By engaging in the acts set forth above, Defendants, by and through their agents, officers and employees, in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733: (i) knowingly presented or caused to be presented to the Government numerous false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the Government; (iii) conspired to defraud the Government by getting a false or fraudulent claim allowed or paid; and/or committed other violations of the

False Claims Act set forth in § 3729(a)(4)-(7).

120. The United States has been damaged as a result of Defendants' violations of the False Claims Act in amounts to be proven at trial.

121. The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of Defendants' violations of 3l U.S.C. § 3729.67.

122. The United States is entitled to a civil penalty of between $5,000.00 and $10,000.00 as required by 31 U.S.C. § 3729(a) for each violation of the False Claims Act by the Defendants.

123. Relators also are entitled to reasonable attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d)(1).

**Count II— Medicaid False Claim Act Violations**

124. Relators hereby incorporate and re-allege the previous paragraphs as if fully set forth herein.

125. In submitting false, misleading, overstated and/or unnecessary claims to the Government, Defendants falsely certified, expressly and/or implicitly, compliance with all Medicaid rules and regulations.

126. By engaging in the acts set forth above, Defendants, by and through their agents, officers and employees, in violation of Michigan's Medicaid False Claim Act, Act 72 of 1977: (i) made or presented or caused to be made or

presented to an officer of the State numerous false or fraudulent claims for payment or approval under the social welfare act; (ii) knowingly made, used, or caused to be made or used, records falsely certifiying that treatment was medically necessary in accordance with professionally accepted standards, which Defendant could and did provide; (iii) conspired to defraud the State by getting a false or fraudulent claim allowed or paid; and/or committed other violations listed of the Medicaid False Claim Act.

127. The State of Michigan has been damaged as a result of Defendants' violations of the False Claims Act in amounts to be proven at trial.

128. The State of Michigan is entitled to damages based upon the amount of damage sustained as a result of Defendants' these violations.

129. The State of Michigan is entitled to a fine or civil penalty for each violation of the Medicaid False Claim Act by the Defendants.

130. Relators also are entitled to reasonable attorneys' fees and costs pursuant to MCL §400.610a(9).

**Count III— Wrongful Termination of Relator Varner in her Own Capacity Per the False Claims Act and Medicaid False Claim Act Violations**

131. Relators hereby incorporate and re-allege the previous paragraphs as if fully set forth herein.

132. Defendant is an employer within the meaning of the False Claims act and

Michigan's Medicaid False Claim Act, MCL § 400.610c(1).

133.   Relator Varner is an employee who was employed by Defendant within the meaning of the False Claims act and Michigan's Medicaid False Claim Act.

134.   Defendant suspended Varner from her duties on or about December 5, 2018 based on actions protected by these Acts, including without limitation, initiating, assisting in or participating in the furtherance of an action under these Acts.

135.   Specifically, during a mediation regarding employment-related claims by Varner, Defendant became aware that State officials were on-site a Havenwyck to investigate a complaint Varner had made to the State of Michigan.

136.   Defendant suspended Varner with pay without providing any reason after she refused to resolve complaints with Defendants then and there, and was thus poised to return to her duties (where she could collect additional information unfavorable to Defendants and/or speak with State investigators in support of her report of wrongful conduct).

137.   To this day, Varner remains on paid suspended status, and has been given no lawful reason for her suspension from work six months ago.

138.   Varner is therefore entitled to reinstatement, damages, including liquidated and special damages and/or exemplary or punitive damages.

### Damages and Relief Requested

139. The Relators, on behalf of themselves and the United States and State of Michigan, request that this Court grant the following relief:

   a.   That judgment be issued against each named Defendant in an amount equal to three times the amount of damages the United States and/or State of Michigan have sustained because of his or its actions, plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs of the United States, and the State of Michigan for their expenses related to this action;

   b.   That the Relators be awarded all costs incurred, including reasonable attorneys' fees;

   c.   That the Relators be awarded 25% (as to the recovery by the United States) or 30% (as to the recovery by the State of Michigan), but in no event less than 15%, of the proceeds of the resulting judgment in, or settlement of, this action;

   d.   That the Relators, the United States and/or State of Michigan be awarded prejudgment interest; and

   e.   That the United States and/or State of Michigan and the Relators receive all relief both at law and at equity, as this Court determines is

appropriate.

140.     Varner in her own capacity prays for reinstatement, front pay, back pay, liquidated/punitive/exemplary and all other statutory and equitable damages available.

Respectfully submitted,
SALVATORE PRESCOTT &
PORTER, PLLC

/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Attorney for Plaintiffs/Relators
105 E. Main Street
Northville, MI 48167
(248) 679-8711
Dated: June 21, 2019                    prescott@spplawyers.com

## **JURY DEMAND**

Plaintiff, by and through their counsel, requests a trial by jury in above-captioned matter.

Respectfully submitted,
SALVATORE PRESCOTT &
PORTER, PLLC

/s/ Sarah S. Prescott

Sarah S. Prescott (P70510)
Attorney for Plaintiffs/Relators
105 E. Main Street
Northville, MI 48167
(248) 679-8711
Dated: June 21, 2019            prescott@spplawyers.com